UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

IN THE MATTER OF THE SEARCH OF:
2033 DANIEL COURT, #1, LEXINGTON,
FAYETTE COUNTY, KENTUCKY, 40504

Case No. 22-MJ-5043-MAS

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, David J. Lowery, Special Agent of the Federal Bureau of Investigation, being duly sworn, depose and state that:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, and have been so employed since July 2011. I am currently assigned to the Lexington Resident Agency, within the Louisville Division of the FBI, and am assigned to investigate white collar matters. I have received training from the FBI Academy in Quantico, Virginia, which covered a variety of investigative techniques, including interviewing, report writing, and an overview of legal statutes and criminal laws. I have personally conducted and assisted in investigations involving wire fraud, mail fraud, and bank fraud.

2. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1347 and 1349, health care fraud and conspiracy to commit health care fraud, 18 U.C.S. § 1028A, aggravated identity theft, and 42 U.S.C. § 1320a-7b, kickbacks, have been committed by known and unknown persons. I have probable cause to believe that a search of the property which is the subject of this affidavit, will reveal evidence of violations of 18 U.S.C. §§ 1347, 1349, and 1028A, and 42 U.S.C. § 1320a-7b.

3. I make this affidavit in support of an application for a search and seizure warrant to search the following: 2033 Daniel Court, #1, Lexington, Fayette County, Kentucky, 40504. The matters set forth in this affidavit are either known personally to me or were related to me by other persons acting in their official capacities as law enforcement officers or employees of both domestic and foreign law enforcement agencies. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## JURISDICTION

4. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

## THE MEDICAID AND MEDICARE PROGRAM

5. Medicaid is a joint federal and state health care program providing benefits to eligible low-income adults, children, pregnant women, elderly adults, and persons with disabilities. In Kentucky, Medicaid is funded by both federal and state governments and is administered by the Kentucky Cabinet for Health and Family Services, consistent with federal guidelines and requirements.

6. Medicaid is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

7. Medicaid covers the costs of physicians' services, outpatient care, and other services, including diagnostic laboratory testing. Diagnostic laboratory testing, including urine drug testing, is covered by Medicaid if it is medically necessary. A service is medically necessary if, *inter alia,* it is (a) based on an individualized assessment of the recipient's medical

needs; (b) reasonable and required to identify, diagnose, or treat a disease, illness, or other medical condition; (c) appropriate in terms of the service, amount, scope, and duration based on generally accepted standards of good medical practice; and (d) provided for medical reasons rather than the primarily the convenience of the individual, the individual's caregiver, or the health care provider. *See* 907 KAR 3:130, Section 2.

8. The Kentucky Department of Medicaid Services contracts with managed care organizations ("MCO's") to administer the Medicaid program in Kentucky, and health care providers must be credentialed with those MCOs in order to receive reimbursement for the services provided. The MCOs may impose additional coverage requirements prior to reimbursing for urine drug testing. For example, Humana-Caresource's Medicaid requirement policy states that urine drug testing performed pursuant to "blanket orders" or "standing orders" will not be reimbursed, nor will urine drug testing performed as a program requirement to live in a residential facility or sober center. Passport Health Plan's guidance states that "[s]tanding orders for specific test panels across members, 'routine panels' or 'custom panels' do not meet medical necessity criteria as they are not individualized to members' specific medical needs." Aetna Better Health of Kentucky guidance similarly describes standing orders for large drug test panels as "Medically inappropriate drug testing."

9. Medicare is a federally funded health care program providing benefits to persons aged 65 and older, persons with permanent kidney failure, and persons receiving social security benefits. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services ("HHS").

10. Medicare is also a "health care benefit program," as defined by 18 U.S.C. § 24(b). Medicare Part B covers the costs of physician's services, outpatient care and other services, including diagnostic laboratory testing.

11. Medicare only pays for services that are reasonable and necessary for the diagnosis or treatment of illness or injury. *See* 42 U.S.C. § 1395y(a)(1)(A). In the context of diagnostic testing, including genetic testing, the relevant regulations state that "[a]ll. . . diagnostic laboratory tests. . . must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." 42 C.F.R. § 410.32(a).

## PROBABLE CAUSE

12. In February 2019, the Lexington Police Department (LPD) received a complaint from the Director of Homelessness of the Lexington-Fayette Urban County Government that an organization called 1st Choice Healthcare ("1st Choice") was potentially exploiting individuals in the homeless population in Lexington, Kentucky by recruiting them to participate in behavioral health treatment for alcohol and drug dependency in exchange for free housing, then billing Medicaid for these services.

13. The LPD investigation revealed that on or about February 1, 2019, 1st Choice representatives paid the initial rent for multiple units in the Fayette Crossing Apartment complex in Lexington, Kentucky, using a check from United Youth Care Services (UYCS), an organization out of North Carolina. According to the LPD investigation, after less than 2 months, the individuals living in Fayette Crossing Apartment complex in the rooms paid by

UYCS were moved to Tates Creek Crossing Apartments and continued to participate in 1st Choice programs.

14. In December 2019, an individual wishing to remain anonymous reported to agents that 1st Choice closed its office located at 2432 Regency Road, Lexington, Kentucky, and patients were moved to a new program being operated at a new location within an apartment building on Daniel Court in Lexington, Kentucky.

15. On December 20, 2019, at 9:30 am, I conducted surveillance near 2033 Daniel Court, Lexington, Kentucky. A black female was seen exiting the apartment building located at 2033 Daniel Court and getting into the driver's seat of a sedan, North Carolina passenger plate PKM4449, while carrying what appeared to be two FedEx packages. A computer check of the license plate revealed the vehicle was registered to an individual named Delores Jordan. Jordan had been listed as a subject in the FBI Charlotte Field Office investigation involving UYCS and several subsidiaries, operating in North Carolina, for falsely billing Medicaid for unnecessary services, such as drug treatment and urine drug screenings.

16. A search of the Kentucky Secretary of State website revealed Jordan is listed as the registered agent and organizer for a company entitled Serenity Keepers, LLC located at 2033 Daniel Court, Suite 1, Lexington, Kentucky, 40504, organized on August 20, 2019. The apartment building at 2033 Daniel Court, Lexington, Kentucky, is a three-story multi-family brick apartment building. Upon entering the building, Apartment 1 is located down a staircase and immediately to the left. Apartment 1 has a white exterior door and there is a black "1" placard affixed to the door.

17. On January 10, 2020, the investigation obtained authorization to install a pole cam near 2033 Daniel Court, Lexington, Kentucky, 40504. The pole camera footage captured

individuals coming and going from 2033 Daniel Court, the apartment building in which the Serenity Keepers office exists, in groups. These instances usually occurred in the morning on weekdays.

18. On February 11, 2020, I interviewed a former patient of Serenity Keepers, with the initials D.R. D.R. explained he resided at an apartment near the Serenity Keepers office while enrolled in the drug treatment program beginning sometime in the Fall of 2019. A staff member of Serenity Keepers, DeSean Alexander, instructed D.R. and others enrolled with WellCare insurance, to list an Advanced Practice Registered Nurse (APRN) named Dawn Carpenter as their primary care physician on WellCare insurance enrollment documents.

19. D.R. advised Serenity Keepers staff conducted routine urine drug screenings on him and others enrolled in the program onsite. D.R. was with the program for approximately two months, but he never met APRN Dawn Carpenter. Nor did D.R. ever meet with a health care professional.

20. Another individual, with the initials W.H., explained she was enrolled in the Serenity Keepers program beginning in November 2019 and continuing for approximately six weeks. According to W.H., staff members at Serenity Keepers assisted W.H. in enrolling in Humana-Care Source Medicaid insurance. Delores Jordan, the program facilitator, met with W.H. and others in the Serenity Keepers program and informed them a counselor would be assigned to them. During W.H.'s six weeks at Serenity Keepers, W.H. had group therapy classes with a peer support specialist, but she never met with a counselor. W.H. did not meet with any medical professionals during her time at Serenity Keepers. W.H. estimated Serenity Keepers staff conducted only two urine drug screenings on her during the six weeks she was there.

21. An auditor with the State of Kentucky, Office of the Attorney General, Office of Medicaid Fraud and Abuse, examined Medicaid billing data for APRN Dawn Carpenter, looking for urine drug test referrals. The Medicaid claims data indicates Carpenter referred a large number of individuals for urine drug screenings to Biotap Medical Laboratory and Aria Diagnostics Laboratory. The majority of the referrals in 2020, over 10,000, were made to Aria Diagnostics. The medical billing codes for many of the specimens included a Presumptive test billing code (80307) and a Definitive test billing code (Primarily G0483). Based on my training and experience, I know a Presumptive urine drug screening to establish only that there is a presence of drugs, while a Definitive test, or confirmation test, is used to identify specific medication in the specimen. The amount billed in 2020 by Aria Diagnostics for these claims, using Carpenter's NPI, was over $4,500,000 in 2020.

22. Among the beneficiaries listed as being referred for drug screenings by Carpenter were patients D.R. and W.H. The data showed that between September 16, 2019 and November 11, 2019, APRN Carpenter referred D.R. for drug screenings on twelve different dates. Between December 20, 2019 and April 1, 2020, Carpenter referred W.H. for drug screenings on thirteen different dates.

23. On or about September 3, 2020, I interviewed APRN Carpenter. She explained while operating as a nurse practitioner in the state of Kentucky, Carpenter was approached by Lily Timberlake, a medical sales representative, on or about September 1, 2019. Timberlake presented Carpenter with an opportunity to work in a part-time manner as a Medical Director for Serenity Keepers. Carpenter was previously unfamiliar with Serenity Keepers.

24. According to Carpenter, Timberlake explained the duties of medical director for Serenity Keepers would involve Carpenter seeing patients enrolled in the sober living program

several times a month and reviewing the urinalysis laboratory results of these patients. On or about September 10, 2019, Timberlake emailed Carpenter a Microsoft Word document from email account LILYSTIMBERLAKE@YAHOO.COM. This document was a letter Timberlake asked Carpenter to sign detailing the above-mentioned duties of the medical director for Serenity Keepers. Carpenter was unsure of who drafted the letter. The letter described the duties of the Medical Director for Serenity Keepers. These duties included; having patients enrolled in the program submit to frequent urine drug screenings, seeing the patients twice a month in person and once a month through telemedicine, and keeping all medical records stored in a locked file cabinet at Serenity Keepers. Carpenter could not remember if she signed the letter and sent it back to Timberlake.

25.    Between September 2019 and October 2019, Carpenter twice went to the offices of Serenity Keepers to see patients. Timberlake accompanied Carpenter to the visits. While there, Carpenter was introduced to the owner of Serenity Keepers, Delores Jordan. Carpenter saw a number of patients during each visit. Timberlake was particularly interested in Carpenter having patients tested for sexually transmitted diseases (STD's). Following the first visit to Serenity Keepers, Carpenter received an email from LILYSTIMBERLAKE@YAHOO.COM with a form attached. The form was from a company called Biotap Medical, a medical laboratory based in Louisville, Kentucky, and was a "provider acknowledgement form" for the authorization of testing urine for STD's. Timberlake asked Carpenter to sign the form as the provider.

26.    On or about November 15, 2019, Carpenter began receiving emails from staff at Biotap Medical requesting copies of medical notes to support medical necessity of 140 urine specimens backlogged at Biotap Medical. The email indicated staff at Biotap Medical attempted to get the notes from "Delores," but "Delores" indicated Carpenter would have the notes.

Carpenter told me she never authorized the laboratory referral of 140 urine specimens. Carpenter estimated she may have authorized 30 referrals for drug screenings over the two days she was at Serenity Keepers. Carpenter said she never received or reviewed any results of drug screenings from Biotap Medical.

27. Carpenter was asked if she has ever referred patients to Aria Diagnostics for urine drug screenings. Carpenter advised she has never referred patients to Aria Diagnostics, nor has she ever heard of the laboratory.

28. Carpenter provided consent for the affiant to review her cellular telephone. As part of this review, SMS messages, among other data, were copied from the phone. A review of the SMS messages revealed several conversations between Carpenter and Timberlake. Carpenter advised Timberlake provided her with a phone number of (502) 930-3630. The affiant located this phone number in Carpenter's contact list under the name of "Lily Timberlake". An analysis of phone data revealed an SMS message exchange between Carpenter and Timberlake. The exchange occurred between November 11, 2019 and November 15, 2019. The following are messages sent during that exchange.

> 11/11/19 – Timberlake – *"Hi there, sorry to bother u – Deloris asked if she can give your contact info to Biotap?"*
>
> 11/11/19 – Carpenter – *"Lets talk about it when I see you if that's ok."*
>
> 11/15/19 – Carpenter – *"Lily I cannot do that with serenity keepers. Biotap is wanting notes on a bunch of the pts. I do not have notes on everyone. I just can't keep up with those people. They come and go too much."*
>
> 11/15/19 – Timberlake – *"As far as Biotap, have they talked to you?"*
>
> 11/15/19 – Carpenter – *"They sent me an email this evening."*

11/15/19 – Timberlake – *"Because I know they were having all patients fill out your registration papers and stuff to begin the process but wasn't sure what they are asking for."*

11/15/19 – Timberlake – *"Meaning Serenity Keepers"*

11/15/19 – Carpenter – *"They want office notes. I have not seen all of these pts. I think she needs to find someone else to do it. I just don't have time to go up there or get all the telemedicine set up. It's a great opportunity, but I am starting to get busier and worth it just being me, I can't keep it all up."*

11/15/19 – Timberlake – *"Would you happen to know any NP's that would be interested?"*

11/15/19 – Timberlake – *"She wanted me to ask you."*

11/15/19 – Carpenter – *"No not really. I'm sorry, but it just more that I expected from what you told me at first."*

29.     Following this exchange, Carpenter did not see any additional patients at Serenity Keepers. Carpenter indicated all referrals made using her NPI number to Aria Diagnostics were done without her authorization. Carpenter said she has never received a drug screening from Aria Diagnostics, Biotap or anyone at Serenity Keepers for her review. Carpenter is not aware of any medical personnel that were on staff at Serenity Keepers during the time these urine drug screenings were ordered. According to the most recently available Medicaid data, Carpenter's NPI number continued to be used fraudulently to refer patients for drug screenings by Serenity Keepers up through August 2021. In August 2021, Serenity Keepers began using the NPI of Dr. John Farmer, an obstetrician based in Louisville, Kentucky.

30.     On January 7, 2021, I interviewed a current patient of Serenity Keepers, with the initials A.J. A.J. explained that she has been enrolled at Serenity Keepers since approximately

June 2020, located at 2033 Daniel Court, Lexington, Kentucky. A.J. explained the program is run by "Ms. Delores" and that Ms. Delores's son, Mr. Harris, runs the day to day operations of Serenity Keepers. A.J. explained she participates in group therapy with a peer support counselor and there are approximately 30 people enrolled in the program, living in the 7-8 units rented by Serenity Keepers. A.J. told me that she has never met with a medical professional in the six months she has been enrolled in the program. A.J. informed me that she does submit to urine drug testing twice a week, but that the results are not reviewed by a medical professional.

31. According to the most recent Medicaid data available, between July and November, 2020, Aria Diagnostics billed approximately $37,000 for urine drug testing of 39 samples for patient A.J., all billed using Carpenter's NPI number as the referring provider.

32. According to a lawfully obtained warrant, I reviewed certain emails from the account of LILYSTIMBERLAKE@YAHOO.COM. In certain emails, LILYSTIMBERLAKE@YAHOO.COM communicated with other email accounts about the business affairs of Serenity Keepers and the lab services being ordered from Aria Diagnostics.

33. On numerous occasions, LILYSTIMBERLAKE@YAHOO.COM forwarded information about Dawn Carpenter to a contact listed as "Deloris Jordan" and "Delores Jordan" with an email address of Shockyd@hotmail.com. For example, on October 30, 2019, LILYSTIMBERLAKE@YAHOO.COM forwarded to Shockyd@hotmail.com an email from Patric Duerr, pduerr@biotapmedical.com, discussing missing medical notes for certain patients.

34. During the search of emails in the account of LILYSTIMBERLAKE@YAHOO.COM, I located emails both to and from the email account that appeared to directly relate to this investigation. These related emails included an email from LILYSTIMBERLAKE@YAHOO.COM to "Deloris Jordan" at SHOCKYD@HOTMAIL.COM

dated September 10, 2019. The email did not have any content, but did include a .PDF attachment. The attachment was a letter purportedly signed by Dawn Carpenter. The letter declared Dawn Carpenter was the medical director for Serenity Keepers, and outlined her duties as it pertained to urinalysis drug screenings and the treatment of patients enrolled in the program.

35. A October 30, 2019 email from LILYSTIMBERLAKE@YAHOO.COM to SHOCKYD@HOTMAIL.COM was originally a forwarded email from Patrick Duerr, PDUERR@BIOTAPMEDICAL.COM, in which Duerr said he had not heard from "Deloris" regarding Biotap's request for the medical notes for patient samples. Duerr advised, "We really need the reimbursements on these patients. Without it, we're losing money." This email corresponds with previous statements to law enforcement by Dawn Carpenter in which she advised Biotap was emailing her requesting medical notes on Serenity Keepers patients she was never aware existed. Additionally, this email fits the time period and subject matter of SMS messages retrieved from Carpenter's cellular phone pursuant to a consent search of the phone revealed a conversation between Carpenter and Timberlake regarding Biotap requesting medical notes.

36. A November 22, 2019 email from "George Powell", powell.georgesummit@gmail.com, to LILYSTIMBERLAKE@YAHOO.COM titled "Re: Lab" informed Timberlake he had found a lab for her to use for the "one account". The email stated the lab would hire "collectors". Powell told Timberlake he would have to bring her on as an employee rather than a "confirmed 1099". The email was signed, "George Powell, President/CEO, Summit Diagnostics".

37. Another email from Powell to Timberlake dated December 3, 2019 was titled "Introduction" and also included the email address for "Vipin Adhlakha", vadhlakha@ariadxs.com. In the email Powell stated, "Vipin, you can contact Lily at this address

for the collector info and any other pieces you may need." Adhlakha responded to the email on the same date indicating they would "get the sites set up and trained."

38.     On December 4, 2019, "Lori Powell", lori@summitdiagnostics.com, emailed Timberlake stating "We are very excited to have you join the Summit Team". Employment documents were sent with the email in the form of attachments.

39.     Timberlake sent an email to "Lori Powell" and "George Powell" on December 13, 2019. There was no message in the email, but there was a .PDF attachment entitled "serenity keepers Aria lab paperwork". The .PDF file was a two-page document with an "Aria Diagnostics" logo at the top of the page. "2019 PROVIDER ACKNOWLEDGEMENT FORM" was printed at the top of the form. Handwritten on the form was "Dawn Carpenter" as the provider, and the NPI number of "1790033934", Carpenter's actual NPI number. The organization was listed as "Serenity Keepers" with a phone number of "(704) 999-8627", address of "2033 Daniel Court, Suite 100, Lexington, KY 40504", an email address of "msanders@yahoo.com". "Makai Sanders" and "Chenise Shauntel Morgan" were listed as specimen collectors. On the second page were check boxes for tests requested. The box for presumptive screening was checked along with all available confirmation test boxes. The form was purportedly signed at the bottom of the second page under "provider signature" by "Dawn Carpenter".

40.     On December 31, 2019, an email was sent from "Caitlin Wynn", cwynn@ariadxs.com to "Tara Miles", tmiles@summitdiagnostics.com, and included Timberlake in the "Cc" line. The document was titled, "Re: Dawn Carpenter Electronic Signature". The message from, "Caitlin Wynn" stated, "Lily, Thank you for sending this over! I have updated the signature to our system." There was a .PDF file attached to this email entitled "Dawn Carpenter – Electronic Signature-2". The .PDF document was a form with the "Aria Doagnostics" logo at the

top. "Electronic Signature Consent Form" was written at the top of the form. The provider information listed Dawn Carpenter as the provider, Serenity Keepers as the organization, dcarpenter@gmail.com as the email address, 704-999-8627 as the phone number and 2033 Daniel Court, Lexington, KY 40504 as the address. The "provider authorization" section of the form stated the signature on the document would be permitted to be used for future laboratory orders by the provider. The document was purportedly signed by Dawn Carpenter and dated December 20, 2019.

41. Through a number of keyword searches of Timberlake's email, I attempted to locate any emails that would indicate Carpenter was a party to the correspondence with Aria Diagnostics or Summit Diagnostics with regards to the use of her name and signature in the forms provided by Timberlake to the respective laboratories. This search revealed no evidence that Carpenter was included or consulted when these forms were sent to the laboratories.

42. On March 4, 2021, I contacted Carpenter and showed her the three forms purportedly containing her signature. Carpenter stated she believed the signature in the document entitled "Dawn Carpenter – Serenity Keepers" was, in fact, her true signature. Upon viewing the signature on the form entitled "serenity keepers Aria lab paperwork" Carpenter said it was not her signature on the form. Furthermore, she advised the email and phone number written on the form did not belong to her and she was not familiar with anyone named Chenise Morgan or Makai Sanders.

43. Upon looking at the document entitled "Dawn Carpenter – Electronic Signature-2", Carpenter advised this signature was not hers. She said the email address listed on the document, dcarpenter@gmail.com, did not belong to her.

44. Carpenter reiterated she had never heard of Aria Diagnostics previously, and she never authorized for anyone to sign her name on either of the Aria Diagnostics documents.

45. According to recently obtained Medicaid billing data, between December 19, 2019, and October 25, 2021, APRN Dawn Carpenter was listed as the referring provider for urine drug test referrals to Aria Diagnostics Laboratory for 10,247 unique claims for 563 patients, for a total billed amount of $8,835,866. According to recently obtained Medicaid billing data, between August 4, 2021, and October 25, 2021, Dr. John Farmer was listed as the referring provider for urine drug test referrals to Aria Diagnostics Laboratory for 1,178 unique claims for 237 patients, for a total billed amount of $899,948.

46. On March 9, 2021, the investigation obtained renewed authorization to utilize the pole cam previously installed near 2033 Daniel Court, Lexington, Kentucky, 40504 for an additional sixty days. The pole camera footage again captured individuals coming and going from 2033 Daniel Court, the apartment building in which the Serenity Keepers office exists, in groups. There was a pattern in which a white male and white female would arrive in a silver vehicle. They would go in and out of the target building, and apartment buildings adjacent to the target building. While they were there, people would gather from these adjacent apartments and walk to the target building. At times, they would also gather in front of the other buildings. This activity seemed consistent with a group meeting held by Serenity Keepers.

47. On December 9, 2021, I interviewed an individual who worked as a Licensed Clinical Social Worker for Serenity Keepers beginning the summer of 2020 through July 2021 ("LCSW-1"). LCSW-1 was hired to do patient intakes and initial diagnoses. In addition, LCSW-1 was responsible for supervising Peer Support Specialists ("PSS") working for Serenity Keepers. LCSW-1 would receive notes from the PSS, sign off on the notes, and send them to Serenity

Keepers' biller. PSS would send LCSW-1 notes indicating they provided six hours of peer support per day per client, for numerous clients. LCSW-1 would attempt to hold regular zoom meetings for training and supervising PSS but very few individuals attended.

48. LCSW-1 indicated she was familiar with an individual named Ernest Williams, who ran approximately six homes in Lexington for Serenity Keepers and was the designated PSS for the individuals living in the homes. At one point, Ernest Williams told LCSW-1 that he was the only PSS for all the individuals living in the six months he managed. According to LCSW-1, in January 2021, Earnest Williams was very far behind in completing his peer support notes and submitting them to LCSW-1 for review. When confronted by LCSW-1, Earnest Williams yelled at LCSW-1 and said he only answered to Jordan.

49. In December 2020, LCSW-1 attended an online training course about documenting services provided. LCSW-1 began to have concerns about the peer support notes at Serenity Keepers and had several conversations with Jordan about the appropriateness of the notes and billing practices at Serenity Keepers. Later in 2021, LCSW-1 learned from a contact familiar with health care billing that a single PSS should only bill for one client per day, which was not how Serenity Keepers was billing. LCSW-1 questioned Jordan and the biller for Serenity Keepers about this practice. LCSW-1 resigned from Serenity Keepers in July 2021.

50. On January 13, 2022, I interviewed a former Peer Support Specialist who worked at Serenity Keepers beginning in approximately May 2021 ("PSS-1"). PSS-1 applied for a position at Serenity Keepers and met with Ernest Williams at the interview and was hired on the spot. PSS-1 was assigned to one of two houses adjacent from each other off of Georgetown Road in Lexington. PSS-1 observed that the conditions at the houses were poor and clients were not provided with toilet paper or other hygiene products. PSS-1 was trained to cut and paste peer

support notes and write the same thing for all clients. PSS-1 knew from prior employment that cutting and pasting notes was improper. Williams told PSS-1 to bill the maximum for peer support each day, even if the clients were not there. Williams instructed PSS-1 to write peer support notes as though the clients were there. While at Serenity Keepers, PSS-1 was involved in the urine drug testing of the clients. At the request of Williams, PSS-1 would put the samples in a grocery bag and give them to Williams or Mikai Sanders, an individual who worked in the main office of Serenity Keepers. PSS-1 ultimately reported the poor conditions of the home to LCSW-1. Williams confronted PSS-1 about this and later fired PSS-1 approximately six weeks after PSS-1 began working for Serenity Keepers.

51.     On January 21, 2022, I interviewed another Peer Support Specialist who worked at Serenity Keepers beginning in approximately March 2021 ("PSS-2"). PSS-2 was not licensed to work as a Peer Support Specialist, so Williams provided his log-in information to PSS-2 for the electronic medical records system used by Serenity Keepers. Williams instructed PSS-2 to hold group and individual therapy sessions with female clients from a house he managed and document the encounters as "notes" in the patients' files in the electronic medical records system. Williams told PSS-2 to conduct counseling for the women for up to six hours a day. PSS-2 reported that some of the clients refused to participate in six hours of counseling a day. Williams instructed PSS-2 to write notes for six hours of counseling even if the clients did not attend. PSS-2 collected urine drug samples from clients twice per week, and provided the samples to Mikai Sanders, the office manager at Serenity Keepers. PSS-2 reported that Serenity Keepers' main office was located in an apartment off of Daniel Drive in Lexington. PSS-2 visited the office on one occasion and observed numerous paper files in the office.

52.     According to recently obtained Medicaid billing data, between July 2, 2020, and October 15, 2021, Serenity Keepers, using the NPI for LCSW-1 and another provider, billed Medicaid for addiction treatment services for 8,618 unique claims for 655 patients, for a total billed amount of $12,046,878.05.  The majority of these claims are for peer support services.

53.     On February 1, 2022, I interviewed Lily Timberlake, whose married name is now Lily Bell.  In that interview, Timberlake admitted to falsifying records related to Dawn Carpenter's enrollment at Aria Diagnostics.  Timberlake began working with Jordan around the time Serenity Keepers began operating in August 2019.  Timberlake reported that in their first discussions of the business, Jordan discussed a high volume of urine drug testing that would be taking place and an expectation that she would be "taken care of" in exchange for the business.  Timberlake explained that she arranged for the labs that Serenity Keepers used for the urine drug testing and, in exchange, paid Jordan kickbacks.  At Jordan's instruction, Timberlake paid approximately $1,300 every two weeks to Jordan's son, Deshawn Dawkins.  Jordan explained to Timberlake that she did not want to receive the payments directly so that they were not traceable to her.  In the fall of 2021, Jordan requested an increased amount due to the increased volume of urine drug testing at Serenity Keepers, and Timberlake began paying Jordan $5,000, every two weeks, giving the payments to Dawkins.  Approximately one month ago, at Jordan's direction, Timberlake began making the payments to Timberlake's boyfriend, Jerome Davis, by electronic transfer.

54.     According to Timberlake, Serenity Keepers is located at 2033 Daniel Court, Apartment 1, in Lexington, Kentucky. Timberlake has been to this location several times and describes it as an apartment unit with chairs set up for group meetings and an office in the back. The office has binders and file folders containing patient files.  Mikai Sanders, a collector who works at Serenity Keepers, uses this space as an office.  Timberlake arranged for Aria Diagnostics,

and later RDX Biosciences, to mail computer equipment and urine drug testing supplies to this location. She also assisted Serenity Keepers employees with setting up the Aria Diagnostics web portal at this location.

55. On February 11, 2022, at approximately 2:00 pm, I conducted surveillance at 2033 Daniel Court, Apartment 1, in Lexington, Kentucky. Upon walking past the closed apartment door, numerous voices could be heard inside the apartment unit. Approximately ten minutes later, between 20 and 30 people walked out of the apartment building at the same time. Based on previous surveillance, and information received from interviews, I know this activity to be consistent with a Serenity Keepers group meeting.

## CONCLUSION

56. Based on the information set forth above, your affiant submits that there is probable cause to believe that, in the timeframe discussed above, in the Eastern District of Kentucky, Delores Jordan and others were involved in a scheme to commit health care fraud by billing medically unnecessary urine drug testing to the Medicare and Medicaid programs, in violation of 18 U.S.C. § 1347, conspiring to commit such an offense, in violation of 18 U.S.C. § 1349, aggravated identity theft, in violation of 18 U.S.C. § 1028A, and 42 U.S.C. § 1320a-7b, kickbacks.

57. Based upon the facts set forth herein, I submit that there is probable cause to search 2033 Daniel Court, #1, Lexington, Fayette County, Kentucky, 40504, as described in **Attachment A**, and seize the items described in Attachment B. From my experience and training in investigating health care fraud, I know that individuals engaged in crimes such as these often maintain records pertaining to their crimes, as well as instrumentalities and fruits of their crimes. Consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic storage media or electronically stored information that reasonably

appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.

## SEALING REQUEST

58. I respectfully request that this Affidavit and the application and search warrant be sealed until the execution of the search warrant. Disclosure of the Affidavit at this time would also seriously jeopardize the ongoing investigation, as the targets would not otherwise be aware of the scope of this warrant or that their activities are currently the subject of an ongoing federal investigation. Disclosure at this time would provide the targets with the opportunity to destroy evidence, change patterns of behavior, notify co-conspirators, or flee. Furthermore, the investigation in this matter is continuing, and disclosing the Affidavit's contents prior to execution will likely preclude or impede the agents and investigators working on this matter from investigating new criminal activity or leads.

Respectfully submitted,

/s/ David J. Lowery
David J. Lowery, Special Agent
Federal Bureau of Investigation

Attested to by the applicant by reliable electronic means (email) in accordance with FRCrP 4.1 on this  15  day of February, 2022.

Honorable Matthew A. Stinnett
United States Magistrate Judge
Eastern District of Kentucky